BURTONE, INC. v THE EQUITABLE LIFE ASSURANCE SOCIETY

1. INSURANCE—CREDIT LIFE INSURANCE—CORPORATIONS—FINANCING
    AGREEMENT—STATUTES.

    Language in a sales financing agreement which provides for
    credit life insurance cannot be construed to mean that the life
    insured is that of the purchasing corporation; the corporation
    cannot die, and has no insurable "life" as that term is used in
    the statute authorizing the issuance of group creditors life
    insurance policies (MCLA 500.4416; MSA 24.14416).

2. INSURANCE—CORPORATIONS—INSURING AGREEMENTS—SIGNATURE
    OF CORPORATE OFFICERS—PERSON INSURED.

    The signature of a party as president of a corporation on a
    financing agreement covering the purchase of goods by the
    corporation is that of a corporate representative, and not of a
    "person" as described in language of the agreement providing
    for credit life insurance on "the person whose signature"
    appears as the buyer; therefore, the insurance is not on the life
    of the corporation's president as such.

3. INSURANCE—PERSON INSURED—OBLIGOR ON NOTE—CORPORATE OF-
    FICERS.

    A credit life insurance policy issued in the name of an individual
    who is a co-obligor on a corporation's note and who was also
    president of the corporation covers the life of that individual
    only and does not apply to another individual who assumed the
    office of president of the corporation after the ownership of the
    corporation had changed hands where there was no assumption
    of the insurance policy or of the note by the new president.

4. CONTRACTS—COURTS—CONSTRUCTION OF CONTRACTS.

    The Court of Appeals cannot make a new contract for the
    contracting parties under the guise of construing the contract.

REFERENCES FOR POINTS IN HEADNOTES
[1] 43 Am Jur 2d, Insurance § 3.
[2, 3] 43 Am Jur 2d, Insurance § 518.
[4] 17 Am Jur 2d, Contracts § 242.

Appeal from Macomb, Robert J. Chrzanowski, J. Submitted June 17, 1976, at Detroit. (Docket No. 25538.) Decided September 8, 1976.

Complaint by Burtone, Inc. against The Equitable Life Assurance Society of the United States, Detroit Bank and Trust Company, and the F. D. Stella Products Company for reformation of a policy of insurance and for payment of the proceeds thereunder. Summary judgment for defendants. Plaintiff appeals. Affirmed.

*Foster, Meadows & Ballard* (by *Robert N. Dunn),* for plaintiff.

*Miller, Canfield, Paddock & Stone* (by *Gilbert E. Gove* and *James W. Goss),* for defendant The Equitable Life Assurance Society of the United States.

Before: R. M. MAHER, P. J., and D. C. RILEY and R. M. RYAN,* JJ.

D. C. RILEY, J. On appeal from a summary judgment issued by the Macomb County Circuit Court, we are asked to determine the identity of the insured under a group credit life insurance policy issued in conjunction with the purchase of certain merchandise and equipment.

Burtone, Inc., plaintiff-appellant, is a Michigan corporation. In 1970, Burtone purchased certain equipment from F. D. Stella Products Co., financing the purchase by giving F. D. Stella a note and security agreement. The note was subsequently sold to the Detroit Bank & Trust Company. At the time of the equipment sale, defendant-appellee,

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Equitable Life Assurance Society of the United States, had issued to Stella a group creditors life insurance policy, pursuant to MCLA 500.4416; MSA 24.14416.

The purpose of a credit life policy is to insure that a noteholder will receive insurance proceeds in the event that a specified debtor dies before completing payment on the note. In this case, the coverage was the lesser of $10,000 or the remaining amount of the indebtedness.

The note and security agreement between Stella and Burtone required that $648 of the $26,107.20 balance of the installment note be applied as a credit life insurance premium payable on the group policy.

The specific language of the Stella-Burtone agreement is crucial to this appeal. The contract stated "[L]ife insurance protection under a Group Creditors Life Insurance Policy * * * is contemplated in connection with this contract on and to cover only the person whose signature first appears below as 'Buyer' ".

Following the corporate name, "Burtone, Inc. (d/b/a Purple Pickle)" are four buyer signatures: "A. G. Nikitas, President"; "Burt LeRoy Dougherty, Vice-President"; "A. G. Nikitas, individually"; and "Burt LeRoy Dougherty, individually". A credit life policy was subsequently issued by Equitable covering the life of Mr. A. G. Nikitas.

In 1971, one year after the agreement was reached, Nikitas and others sold all interest in Burtone to George Fikany and his wife. Mr. Fikany became president of Burtone. There was no revision or assumption of the credit life insurance clause, nor of any part of the note and agreement. After Fikany's purchase, Burtone continued to make note payments to the noteholder, Detroit

Bank & Trust. Portions of the note payments were forwarded to Equitable as premiums on the group policy. Fikany never assumed any written personal obligation and Nikitas remained personally liable.

George Fikany died in 1972. At his death, more than $10,000 remained owing on the note. When Equitable failed to honor the request of Burtone for payment of insurance proceeds allegedly owing because of Fikany's death, Burtone commenced an action for reformation of the contract against Equitable, Stella, and Detroit Bank & Trust in the Macomb County Circuit Court. On a set of stipulated facts,[1] the court granted summary judgment for defendants, holding that the credit life insurance clause could not be reformed by substituting Fikany's name for Nikitas'.

The present argument of Burtone, when simplified, is that the credit life insurance policy was intended to insure the life of the "keyman" of the company, whoever that "keyman" might be. It is argued that when Nikitas signed the contract as "President", the parties agreed that whatever person was president of Burtone was the insured "keyman".

The contract language could arguably suggest a number of interpretations: (1) the "person" whose signature first appears is the corporation, Burtone, represented by its then president; (2) the "person" is whoever might be president at the time an installment is due; (3) the "person" is Nikitas, but his life is insured only as long as he remains president; (4) the "person" is Nikitas as an individual; and (5) owing to incurable ambiguity, no individual is the insured "person".

---

[1] Certain summary judgment motions may be presented and decided by the use of stipulated facts. *E.g., Todd v Biglow,* 51 Mich App 346, 350; 214 NW2d 733 (1974).

We adopt that option chosen by the trial court and rule that the proper interpretation is that A. G. Nikitas, as individual, was the insured person. His life remained insured under the group credit life insurance policy even after his departure from the presidency.

The parties' stipulated facts establish that Burtone was the purchaser of the equipment and was liable on the note. The first two signatures—"A. G. Nikitas, President" and "Burt LeRoy Dougherty, Vice-President"—are in a representative capacity, binding the Burtone corporation to the contract. Compare *Archbold v Industrial Land Co,* 264 Mich 289; 249 NW 858 (1933), with *Moscone v Mitoff,* 33 Mich App 259, 260; 189 NW2d 763 (1971). Establishing corporate liability is all the first two signatures accomplish.

The credit life insurance language in the agreement cannot be construed to cover the life of the Burtone corporation; the corporation has no insurable "life" as that term is used in the statute authorizing group life insurance. MCLA 500.4416; MSA 24.14416.[2] The corporation is not the insured, for the corporation cannot die. To so hold would require a forced or strained interpretation of the sales agreement and the insurance policy. *Edgar's Warehouse, Inc v United States Fidelity & Guaranty Co,* 375 Mich 598; 134 NW2d 746 (1965).

In short, the language in the financing agreement referring to "the *person* whose signature first appears below as 'Buyer' ", (emphasis added), cannot refer to the corporation. Because the first two signatures are representative signatures of the purchaser corporation, the insurance clause does

---

[2] We note that an insurer may insure certain "commercial credit risks" of a corporation. *See,* 13 Couch on Insurance 2d, § 48.37 *et seq.,* pp 540–563. The present contract did not call for a commercial credit risk policy, but for a credit life insurance policy.

not cover the first signature of "A. G. Nikitas, President". That signature is not the signature of a person *qua* person, but of a corporate representative.

The first "person" whose signature appears is "Mr. A. G. Nikitas, individually". We have little doubt that it was the contracting parties' intent that his life was insured for the life of the loan. A policy was in fact issued by Equitable in Nikitas' name. The sales agreement referred to Stella's group life insurance policy, a policy that clearly is concerned with the death of individual debtors.[3]

The fact that Burtone continued to make premium payments on Nikitas' life even after Fikany assumed the presidency does not trouble us. Stella, or a subsequent assignee, as beneficiary of the insurance policy, certainly had an insurable interest in the life of the co-obligor to the note.[4] *Secor v Pioneer Foundry Co, Inc,* 20 Mich App 30; 173 NW2d 780 (1969). Stella could require that Burtone pay the insurance premium as part of the sales agreement. There is little doubt that Equitable would have had to pay the proceeds of the policy to the noteholder in the event Nikitas perished.[5] Stella and Detroit Bank & Trust were well within their rights in accepting installment pay-

[3] As an aside, we find no basis for plaintiff's argument that the trial court stepped outside the stipulated facts in reaching its conclusion. All that the court found, and all that we decide, may be derived from the face of the contract and accompanying stipulated facts.

[4] Alternately, it could be argued that Burtone is a beneficiary of the policy in that it benefits in the event of a co-obligor's death. Burtone could be argued to have an insurable interest in Nikitas' life. *Secor v Pioneer Foundry, Co, Inc,* 20 Mich App 30; 173 NW2d 780 (1969).

[5] Nikitas, although not the owner of the equipment, can be considered the "purchaser" for statutory purposes. Group life insurance coverage is limited by statute to "borrowers from one financial institution" or "purchasers of merchandise". MCLA 500.4416; MSA 24.14416. By becoming a co-obligor of the note, Nikitas became a co-purchaser, albeit one without ownership rights.

ments from Burtone and tendering premium payments to Equitable.

In sum, plaintiff has established no basis for reformation under any recognized doctrine of contract construction. *Najor v Wayne National Life Insurance Co,* 23 Mich App 260, 272; 178 NW2d 504 (1970). The sales contract is unambiguous. The benefits that Burtone now seeks were more easily attainable by revision or assumption of the note when Fikany purchased the corporation. We cannot make a new contract for the parties under the guise of construing the contract. *Sturgis National Bank v Maryland Casualty Co,* 252 Mich 426; 233 NW 367 (1930).

Affirmed. Costs to appellees.